**STATE of Missouri,
Plaintiff-Respondent,**

v.

**William J. BEEDLE, Sr.,
Defendant-Appellant.**

**No. WD31449.**

Missouri Court of Appeals,
Western District.

June 2, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 11, 1981.

Commodore McFarland Combs, Jr., Kansas City, for defendant-appellant.

John Ashcroft, Atty. Gen., Jefferson City, Catheryn B. Starke, Asst. Atty. Gen., Kansas City, for plaintiff-respondent.

Before MANFORD, P. J., and DIXON and NUGENT, JJ.

DIXON, Judge.

Appeal by defendant from a conviction of robbery in the first degree. Defendant raises several points. Only three require consideration: the sufficiency of the evidence to support the conviction, the admission of certain evidence, and the trial court's response to a written inquiry from the jury.

Error which requires reversal appears in the written response of the trial court to the inquiry from the jury and in the admission of money found in the defendant's wallet. The evidence to support the conviction is sufficient.

When all of the evidence tending to support the verdict is viewed as true, contrary evidence disregarded, and every inference supporting the verdict indulged, as this court must do when reviewing a jury conviction, *State v. Anderson*, 606 S.W.2d 214 (Mo.App.1980), the following could have been reasonably found by the jury.

On the morning of April 3, 1979, shortly before 6 a. m., Clara Denney, a 70-year-old cafeteria cashier at a local high school, was robbed at gunpoint by a white male as she opened the school safe containing two days receipts and the operating change of the cafeteria.

The robber was wearing a red and white ski mask pulled down to his eyebrows, but his face and neck area were fully exposed. He sniffled continuously as if he had an allergy. The office in which the robbery took place was well lit, the robber was 3–4 feet away, and the victim viewed him for ten minutes. Over $1,100 was taken by the robber, who fled after telling Mrs. Denney he did not want her purse and directing her to go out of the office the way she came in.

The victim collapsed after ringing for the school custodian, who assisted her to the custodian's office. In the office, she talked with the custodian and a 16-year-old cafeteria porter named Bill Beedle, Jr. She told the custodian and Beedle, Jr. that the robber looked like Beedle's father but that he appeared heavier than Beedle's father. Beedle at that time denied that it could have been his father, stating that he had just left his father asleep at home.

Bill Beedle, Sr., the defendant here and the individual whom Mrs. Denney compared the robber to, had been employed as a night custodian at the school for three months prior to the robbery. He had been fired the week before the robbery for tardiness and absenteeism. Mrs. Denney and he knew each other—she had fixed his lunch on 10 or 12 occasions during his last weeks at work. At the time of the robbery, she did not know he had been fired.

Upon the arrival of the police, Mrs. Denney gave two incident reports to the officers. She did not mention Bill Beedle, Sr., as a suspect to either of the officers, their reports would reflect that the robber was a "stranger" and had "unknown facial shape." She gave a physical description to the officers. However, other school personnel did volunteer the name of Bill Beedle, Sr. as a possible suspect, along with several

others, due to his recent termination and familiarity with the school.

The following morning, defendant was arrested as a suspect and taken to the police station for questioning. He voluntarily submitted to questioning and agreed to be in a lineup. Mrs. Denney positively identified him as the robber.

At trial, Mrs. Denney blamed her inability to name defendant as a suspect the day before the lineup identification on the upsetting nature of the incident and the attendant confusion when she was questioned. She stated she became convinced that defendant was the robber later that day after discussing the matter with other school personnel. Mrs. Denney's testimony provided virtually all the evidence to support the conviction.

In a valiant but obviously unsuccessful attempt to impeach Mrs. Denney's eyewitness identification, counsel for defendant confronted her with her preliminary hearing testimony, taken nine days after the robbery, her deposition, and a written statement she gave the police the day after the robbery. It is the trial court's response to a request from the jury regarding this information which provides the grounds for reversal.

Mrs. Denney was first cross-examined about discrepancies between her trial testimony and her testimony at the preliminary hearing. Without detailing all of the inconsistencies, it suffices for the issue here presented to say that as to one critical question and answer read to her she denied the statement. The substance of the question and answer will be later noted. Although at this juncture the transcript of the preliminary hearing was not introduced into evidence, no objection was made to defense counsel's use of the transcript in framing questions.

Defense counsel next questioned Mrs. Denney about discrepancies between her trial testimony and deposition testimony. Again, there was a conflict in the testimony, the depositions were not offered into evidence, and there was no objection to the method of questioning. No objection was lodged by the State, nor was any limitation on the use of the inconsistent statements requested when the questions were asked and answered.

Mrs. Denney was next confronted with the statement (Exhibit # 5) she gave the police after viewing the lineup, in which she unequivocally identified defendant as the perpetrator of the crime. Defense counsel attempted to show that there were portions of the statement which did not come from personal observations of the victim, but which came about as a result of post-robbery conversations with other employees, and that the statement conflicted with her deposition testimony.

The prosecution then tried to rehabilitate the witness through the use of the statement and successfully introduced it into evidence with the following limiting instruction to the jury from the court:

THE COURT: Objection will be overruled.

Defendant's Exhibit 5 is admitted into evidence as evidence of a statement made earlier consistent with the witness' testimony here today, and not necessarily as evidence, itself; it's evidence of evidence, if that makes sense, members of the jury. It's here and offered and received as evidence of the fact that this witness made a statement consistent with her testimony here today, before she testified here today. If that—it's kind of a tricky little area, but it's evidence of evidence and not received as evidence in and of itself, except as to the matters directly elicited therefrom by one of the other of the counsel.

The state, over the objection of the defendant, later introduced evidence of the amount of money found in defendant's wallet at the time of his arrest. The defendant testified and the case was submitted to the jury. The jury went out at 4:14 p. m. and at 5:46 sent the judge note containing a request. After about a 30-minute discussion, the court sent a written reply and the jury, within 15 minutes, returned a verdict of guilty and a 10-year sentence.

The first issue is the propriety of the trial court's action in sending the written reply to the jury. This issue arises in a most peculiar procedural format. It is impossible to paraphrase and obtain a proper understanding of what occurred at trial which gave rise to the issue, and the factual background will be developed with the transcript verbatim.

As noted, the eye witness had explicitly denied that she had been asked a question and that she answered it in a certain fashion. There is no dispute that the question and answer she denied from the magistrate court transcript were as follows:

'Question: What caused that impression? Can you tell the Court?

Answer: Well, because I thought I knew him. That was the first thought. I turned around, and that's just an impression. It's just the first impression.

Question: That is all, but you did not make that from any facial characteristics you could see or anything?

Answer: No.'

As previously noted, defense counsel had read several questions and answers from a document and the witness admitted that the questions had been asked and the answers given. There had been no objection to that line of questioning, and there was no attempt to limit the evidence to impeachment only. There can be no doubt from the form of the questions that the jury was aware that defense counsel was utilizing a "transcript" of the preliminary hearing. Some of these answers contradicted trial testimony of the witness. When the deposition and the witness's statement were used in cross examination, there was also a passing reference to the "transcript" of the deposition, but the statement of the witness which was admitted in evidence was never referred to as a "transcript."

The deposition was never offered in evidence, but the questions and answers admitted to be correct by the witness were not objected to nor limited in any way. As noted, there was objection and an oral instruction as to the purpose and use of the victim's statement.

At some point immediately following the testimony of the eye witness, the following colloquy occurred *out of the hearing of the jury*:

THE COURT: Is there any other matter that should be disposed of out of the presence and hearing of the jury, while the jury is up in the jury room?

MR. SCHAFFER: The Stipulation is being typed now, and then will be marked by Mrs. Taylor; it should be available for the Court's reading to begin the day, if you wish, within five minutes or so, I would imagine.

THE COURT: All right. I assume from that, that the typing of the Stipulation has to do with the certification of the Court Reporter that transcribed a preliminary hearing evidence and testimony to the fact that the transcript—typed transcript, which was used by both counsel in direct and cross-examination of the witness, Clara E. Denney, is a true and accurate reproduction of that court reporter's notes of the evidence and testimony taken on April 14, 1979, of the preliminary hearing.

MR. SCHAFFER: The exact wording.

THE COURT: I mean, is that—

MR. SCHAFFER: That's the gist of it.

THE COURT: —that is what the Stipulation relates to?

MR. SCHAFFER: Yes, sir.

THE COURT: A part of the defendant's case, I assume. I don't know.

MR. COMBS: Yes; I think that logically would be where we would read it into evidence.

THE COURT: If counsel wished to read the certificate, into the record, of that court reporter to argue the credibility of the witness on that point.

MR. COMBS: That's the reason for the Stipulation to be entered, mechanically to be signed, and at the time, and appropriate time, use would be made of it by defense counsel in arguing that testimony—

THE COURT: All right.

MR. COMBS: —of Mrs. Denney.

MR. SCHAFFER: I'll ask for a limiting instruction by the Court with regard to that Stipulation, insofar as it is not to be taken as real evidence in the case, but only for the purpose of the jury weighing her credibility.

THE COURT: We'll deal with that when it becomes necessary.

After all the evidence was in, defense counsel apparently realized the Stipulation concerning the preliminary hearing transcript was not before the jury and a request to reopen defendant's evidence was made and granted. Then *in the presence of the jury* the following occurred:

(Defendant's Exhibit Number 11 is marked for identification by the reporter.)

(Proceedings returned to open court.)

MR. COMBS: If the Court please? The defendant does herewith offer—

THE COURT: For the record—excuse me, Mr. Combs.

Members of the jury, just through an inadvertence some evidence was omitted that the Court is granting defendant leave to re-open the evidence in this case for the limited purpose of completing the evidence as will shortly follow.

### DEFENDANT'S EVIDENCE RE–OPENED

MR. COMBS: And, your Honor, it is that Defendant's Exhibit Number 11, which is a stipulation duly signed by the prosecuting attorney and myself, is offered into evidence at this time.

MR. SCHAFFER: State has no objection to the admission of that document into evidence. *State would have a request, however, that the Court advise the jury that the contents of that document can be considered only with regard to the credibility of the witness and not as evidence, in and of itself.*

THE COURT: *Well, I'm not going to qualify a stipulation not otherwise qualified within the body of it.* Of course, both counsel realize the stipulation applies, the legal effect of this stipulation and the legal effect of this amendment, if you attempt to improperly argue the effect of this stipulation or the effect of the subject of that stipulation, the Court, sua sponte, decends [*sic*] upon the person politely, but firmly and cautions them that they have exceeded the bounds of appropriate argument at the proper time. I know it won't even happen.

Members of the jury, for your information and to complete the evidence record in this case on behalf of the defendant, the Court will read to you and read into the record the stipulation referred to as Exhibit 11; and it is as follows: "The attorney for the State, Mr. Schaffer, and the attorney for the defendant, Mr. Combs, have, in the interest of saving the Court's and the jury's time, agreed to the following statement:

If Brenda Gilliland, the court reporter who took the stenographic notes at William J. Beedle, Sr.'s preliminary hearing on April 12, 1979, were called as a witness she would testify that her stenographic notes show that Mrs. Clara Denney, after being duly sworn as a witness, testified and was asked the following questions and gave the following answers:

'Question: What caused that impression? Can you tell the Court?

Answer: Well, because I thought I knew him. That was the first thought. I turned around, and that's just an impression. It's just the first impression.

Question: That is all, but you did not make that from any facial characteristics you could see or anything?

Answer: No.

The above statement is agreed and stipulated to this 6th day of September, 1979.' "

And the same bears the signature of Larry A. Schaffer, counsel for the State and Mr. Commodore M. Combs, Jr., counsel for the defendant, William J. Beedle, Sr. *Therefore, for the purposes stated and it's self-explanatory, the stipulation, itself, may be considered for those purposes.*

Now then, the record will reflect that all of the evidence in the case has been concluded and to complete our procedure this afternoon, it's now twenty-five minutes after five, I'm not going to keep you thirty second [*sic*] longer, members of the jury. We would ask again that you be in the jury room at no later than twenty-five minutes after 9:00 in the morning and the case will be submitted to you at 9:30 for your consideration and your deliberation and your verdicts under the instructions of law, which I will give to you at that time.

During the jury's deliberation, the court received the jury's inquiry. To the extent that the 30-minute conference of the court and the lawyers concerning the response is in the record, it is as follows:

(At 5:46 p. m., the following proceedings were had in chambers:)

THE COURT: In the matter of State versus Beedle. The jury did indicate that they had need for something by using the buzzer. As Mr. Donnici advised them, upon my instructions, he inquired as to the question or the situation; and in response to my instructions, there being a question, reduced it to writing and it is as follows; 'Your Honor, we would like to see the transcript as pertaining to Mrs. Denney's testimony." (Signed) John Hutman III, Foreman. That's H-u-t-m-a-n, John Hutman roman numeral III. I'm not entirely clear as to the request of the jury makes an inference that they want a transcript of all that witness' testimony; it permits an inference that they want a transcript of the preliminary hearing testimony of that witness, it permits an inference that they want a copy of the deposition testimony, it permits the inference that they want to see the copy of the statement of that witness, given to the police officers on September—or April 3 or 4, I think, and I really don't know what it is, or it could be an inference that they want the last three named items, or all four items, so I'm not entirely clear.

If it's the jury's desire to see the transcript of the witness' preliminary hearing

testimony, that was not offered into evidence, and only a portion thereof, by way of cross-examination and rebuttal by the State, and that would only go as to her credibility. The transcript, portions thereof, and for a very limited purpose; and that's equally true of the deposition of that witness. A portion was utilized in cross-examination; I can't remember whether the State rehabilitated the witness by completing, at the moment, I think that you probably did.

MR. SCHAFFER: Yes, sir; I did.

THE COURT: Because you rehabilitated, as I recall, that is the State, out of both the preliminary hearing transcript, as well as the deposition testimony.

MR. SCHAFFER: Yes, sir.

THE COURT: With reference to the fourth item, Defendant's Exhibit 5, I believe, I believe that the record will reflect that it was used—I think it was used and I think it was offered, and admitted. I can't remember at the moment who offered it.

MR. SCHAFFER: State offered it, your Honor.

THE COURT: At what time was it offered during, for the record? I'm reviewing the Court's notes of the trial.

MR. SCHAFFER: Yes, sir; it was in the beginning of redirect examination of the witness Denney.

THE COURT: Yes. Yes; that's correct. The State moved the admission of Defendant's Exhibit 5 at the close of the first redirect of this witness after defendant utilized the document in the course of cross-examination. Upon the document being offered, the Court admitted it, Exhibit 5.

But as I recall there was an instruction to the jury that it was being admitted for a limited purpose. And did that relate to the stipulation?

MR. SCHAFFER: No. The Court instructed the jury that it was being admitted for the limited purpose of showing a prior statement consistent with her testimony at trial, made before the time of

her testimony at the deposition. Those would be the two jury issues in this case, your Honor.

THE COURT: Pardon?

MR. SCHAFFER: Those prior consistent statements go to two of the issues in this case. One is whether or not she identified the defendant on his facial characteristics and the other is whether or not she knew of his having been fired on the date that she said in that statement and so forth.

THE COURT: Sorry. But the paraphrasing of the witness' statement by the police secretary is a little hilarious sometimes. I realize this is a serious case to the defendant and to the State, but I just—I'm sorry. I suppose the record would have been silent about the Court having smiled; but I can't help but comment. I cannot imagine Clara Denney saying, on April 4, 1979, "At about 12:30 p. m. I responded to the Robbery Unit." or "When I met Detective Barfield who escorted me into a large room." Most people go to a place and are taken to a large room; but maybe Mrs. Denney, who I doubt, being some seventy years of age, uses that language, which is particularly of the police department. I guess that must appear in a manual somewhere.

Okay. Very well. Then in response to the written request, which appears of record now, I propose to make the following written response: "Members of the jury: I'm not sure that I understand your written request that you would like to see." I'm sorry; repeating: "I'm not sure that I understand your written request that you would like to see the transcript as pertaining to Mrs. Denney's testimony."

"If you mean that you would like to see a transcript of any or all of Mrs. Denney's testimony during this trial, that cannot be seen because there is none to be seen.

If you mean a transcript of her testimony given at the preliminary hearing mentioned in the evidence, then that cannot be seen because that transcript was not offered into evidence during this trial, but only a limited portion thereof, and only for the purpose of cross-examining and rehabilitating this witness.

If you mean a transcript of the deposition, given by Mrs. Denney before this trial, then that cannot be sent for the same reason given regarding the preliminary hearing transcript referred to in paragraph immediately above.

If you mean a copy of her statement given to the police, admitted into evidence as Exhibit Number 5, then that exhibit may be sent. However, you must remember that the Court instructed the jury that the exhibit was being admitted for the sole purpose of showing that this witness gave a statement before her testimony during the trial which was consistent with her testimony at trial, and not for the purpose of showing the truth of any matter stated in Exhibit 5—number 5.

Please advise further of any further or other requests, made in the same manner in which you made your first request. (Signed) William J. Marsh, Judge. Dated September 7, 1979."

Does anybody object to that?

MR. COMBS: Yes, your Honor. I don't believe that response is responsive to the jury's request.

THE COURT: What does counsel suggest?

MR. COMBS: I suggest that the request that the jury made has reference to the transcript of Clara Denney's testimony. In no place is there a reference to the statement of Clara E. Denney or the deposition of Clara E. Denney or the transcript of Clara E. Denney's testimony at that trial.

THE COURT: I would ask counsel to prepare a response, an alternative to that which the Court proposes to make, and I will consider it. I would ask that you write it out, because I'm simply getting kind of tired of writing today. Reauthor whatever response you believe appropriate.

What is the State's position on the matter?

MR. SCHAFFER: The State has no objection to what the Court intends to submit to the jury.

THE COURT: Okay.

For the record, while we are here, it is now 6:11 p. m. and the cause was submitted for the jury's deliberation and verdict at 4:12 p. m., two hours ago.

All right. Counsel for the defendant has proposed the following written response: "The Court does not understand what the jury wishes.

Which transcript of Clara E. Denney do you mean? (Signed) The Court."

I think we are talking about the same thing, Mr. Combs. We would have to exchange a series of correspondence, which, at this time of day would be imposing on the jury. I don't mean to take any pride in authorship; I put it on an eithe [sic] or proposition, black or white; I could not give them a transcript of the trial testimony, I would not give them a transcript of the preliminary hearing testimony, I could not give them a transcript of her deposition testimony and if, when they say "transcript" that included the only other, apparently in the vernacular of the jury, or their understanding of legal matters, the statement. Then, as I have indicated, for the limited purpose only, to my knowledge, no other kind of proceedings could be in the stretch of imagination be called, in a layman's terms be called the transcript. I simply said take one or all.

MR. COMBS: But what I think the Court has also done, in its communication to the jury, has made reference to State's Exhibit Number 5.

THE COURT: No; that Defendant's Exhibit Number 5.

MR. COMBS: The Defendant's Exhibit Number 5, which the State offered and the Court with respect to having made mention of that being a prior consistent statement of Clara E. Denney, if I have properly paraphrased it—

THE COURT: No, you didn't properly paraphrase it. What the Court instructed was it was not to be considered as evidence of the truth of the matters stated therein, only as evidence to show that—that—that it was given prior to the

trial and consistent with her testimony given at trial, after it had been used to demonstrate that some of her trial testimony was not consistent.

I don't want to debate, it's way too late in the afternoon to get philosophical. The Court is satisfied—I appreciate your efforts, Mr. Combs; I am satisfied that the Court's response is the most appropriate, encompasses everything that counsel has suggested, is really more to the point and will accomplish more at this time of day and the jury's time, they have been here since 9:30 this morning, as well as I. I decline to utilize defendant's suggestion and do determine that I will submit the written response, two yellow pages that I have read in the record.

I will ask Mr. Donnici to deliver that to the jury; and we will be in recess.

In considering the claim of error based on the note sent to the jury by the trial judge, certain basic principles must be kept in mind. First, such communications assume great weight in the eyes of the jury.

Basic principles of jury trials require jurors to perform their role free from extraneous factors. In the eyes of many jurors the trial judge can do no wrong; his word is law and jurors are sensitive to what he says and does. To this end, in *State v. Taylor*, 336 S.W.2d 495[6, 7] (Mo. 1960), the court warned: " 'The practice of exchanging communications with a [deliberating] jury by the trial court is not commended.' "
*State v. Sanders*, 552 S.W.2d 39, 40 (Mo. App.1977).

Second, any such communication is fraught with the peril of being considered a comment upon the evidence contrary to § 546.380 RSMo 1978 and former Rule 26.09, now Rule 27.06, or concomitantly be an erroneous declaration of the law applicable to the case. Such communications are essentially instructive to the jury in the light of the inquiry made and are not subject to rigorous scrutiny before they are given to the jury.

Because of the interrelationship of the two principles and the nature of the judicial

review for prejudice, such communications, seemingly innocuous on their face, may create reversible error in a close case. This is particularly true when the question and the court's communication are addressed to the issue which is hotly contested and which causes the case to be a close one.

In the instant case, the determinative issue was the credibility of the victim, vis-a-vis, the identification of the defendant. The State contends that her identification was unequivocal, but the record belies that contention. The defendant was a person with whom she had worked and who had been observed by her on a daily basis up until two or three days before the robbery. The robber's features were not masked, the lighting was good, there was a substantial period of time elapsed during the confrontation. Despite all of this, she did not give the defendant's name to the investigating officers. She did tell the defendant's son that the robber "looked like the defendant" but was "heavier." Nor did the physical description given match closely the description of the defendant. She admitted to discussing with non-witnesses the probability of the defendant's guilt, and she did, a day later, identify the defendant in a lineup. However, her testimony at the preliminary hearing nine days later reflected her continued uncertainty as to the *confrontational identification.* That is the crucial preliminary examination testimony she specifically denied and which was the subject of the stipulation.

In the instant case, that portion of the court's response which referred to the preliminary hearing transcript and the deposition of Mrs. Denney stated: [they] "cannot be seen because [they were] not offered into evidence during this trial, but only a limited portion thereof, and *only for the purpose of cross-examining and rehabilitating this witness.*"

This response is erroneous under the holding in *State v. Nimrod,* 484 S.W.2d 475 (Mo.1972), in which it was held that when a defendant in a criminal case sought to offer impeaching testimony, the failure of the state to object or seek a limiting instruction

allows the evidence to be considered for all purposes.

Here, defendant's attorney was allowed, without objection or request for limiting instruction by the state, to confront Mrs. Denney extensively with her prior inconsistent statements. This became substantive evidence for the jury's consideration, *State v. Thomas,* 440 S.W.2d 467 (Mo. 1969), and was not limited for "cross-examination purposes or rehabilitation." Additionally, the stipulation was not limited by the court when it was offered, despite the request by the state. Thus, all of the preliminary hearing testimony was before the jury for all purposes and the court's description of the function of that evidence was erroneous. Even if it be assumed that the trial court could, at that stage in the trial, rectify his error as to the state's request for a limitation upon the evidence presented in the stipulation, the direction to the jury does not properly inform them as to the function of the evidence as impeachment evidence. The jury could not be expected to read into the language "purpose of cross-examination and rehabilitation," the content of MAI–CR 3.52, which had been properly given to them with the other instructions since the eye witness's statement had been expressly limited to use as a prior consistent statement.

The court's response to the jury was likewise a comment upon the evidence contrary to § 546.380 RSMo 1978 and former Rule 26.09 now Rule 27.06. The court's message viewed as a whole told the jury that they *could not* have the transcript of the magistrate court hearing and the deposition because they were not in evidence despite the fact that at least a part of the magistrate court transcript had been read to them pursuant to the stipulation and other portions had become part of the evidence by the eye witness's affirmation of the questions and answers without limiting objection.

The jury could not help but believe that the trial court was removing those matters from their consideration. In that respect, the instant case is analogous to *State v. Fields,* 314 S.W.2d 723 (Mo.1958), where a

trial court's erroneous declaration of what the evidence was was held to be an erroneous comment.

It is inescapable that the message of the trial court to the jury helped resolve whatever doubt existed in the minds of the juror or jurors who requested the transcript. The jury returned its verdict within 15 minutes after receipt of the response. In an analogous situation, the court in *State v. Taylor*, 581 S.W.2d 127 (Mo.App.1979), said:

It is not necessary to demonstrate to a point of certainty that the error influenced the verdict, only a showing of reasonable probability of prejudice. *Teaney v. City of St. Joseph*, 548 S.W.2d 254 (Mo.App.1977). " 'If when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand [but] if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.' " *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Where, as here, the state's case rested almost solely on the testimony of Mrs. Denney, the jury expressed a specific interest in seeing "the transcript of her testimony," and the directions and instructions regarding such testimony were contradictory and inconsistent, it cannot be said that the error did not influence the verdict.

Defendant's brief also contains other assertions of error, only one of which warrants comment here, due to the possibility of recurrence at a new trial.

During the course of the trial, the state, over vigorous objection, was permitted to introduce into evidence the contents of defendant's wallet, seized when he was arrested the day after the robbery. Detective McKinney was allowed to state that defendant's wallet contained seven ten-dollar bills and one twenty-dollar bill. Over $1,100 was taken in the robbery.

Defendant's objection at trial had a dual foundation: that the evidence came about as a result of an illegal search and that there was no foundation or relation between the money taken in the robbery and that found in his wallet. Only the latter ground is pursued here.

*State v. Ball*, 339 S.W.2d 783 (Mo. banc 1960), reversed a conviction for armed robbery on a similar factual situation. In *Ball*,

[A] jewelry store was robbed of jewelry worth $4,455 and $140 in cash. Officers found a lady's ring, a man's wristwatch and $258.02 in cash on defendant's person when arrested 19 days after the robbery. The jeweler could not identify either the jewelry or the money as having been taken in the robbery. There was no proof of "sudden affluence"—that defendant had suddenly come into possession of the $258.02. In these circumstances the Court applied the rule that " 'The mere possession of a quantity of money is in itself no indication that the possessor was the taker of money charged as taken, because in general all money of the same denomination and material is alike, and the hypothesis that the money found is the same as the money taken is too forced and extraordinary to be receivable.' " 1 Wigmore on Evidence, Sec. 154, p. 601. Continuing, the Court said, " 'In the absence of proof or of a fair inference from the record that the money in Ball's possession at the time of his arrest came from or had some connection with the robbery and in the absence of a plain showing of his impecuniousness before the robbery and his sudden affluence (*State v. Garrett*, 285 Mo. 279, 226 S.W. 4), the evidence was not in fact relevant and in the circumstances was obviously prejudicial for if it did not tend to prove the offense for which the appellant was on trial the jury may have inferred that he was guilty of another robbery. [Citing cases.] The admission of the evidence in the circumstances of this record infringed the right to a fair trial * * *.' " 339 S.W.2d 786.

*State v. Vernor*, 522 S.W.2d 312 (Mo.App. 1975).

In *State v. Vernor, supra*, the court found the admission of such evidence erroneous, but not prejudicially so due to the "strong case" the state made from the testimony of three eyewitnesses and an accomplice of defendant. The facts in the instant case are practically parallel to those in *Vernor*. In *Vernor*, the money taken from the defendant was $83.50. The total lost was $800; $250 went to the driver, and the remaining loot to be divided was $550. The defendant's possession of $83.50 two days after the robbery was of "little significance" without additional evidence to connect it with the robbery.

The state opines that defendant's assertion of error is "completely without merit," citing *State v. Gyngard*, 333 S.W.2d 73 (Mo. 1960); *State v. Harris*, 539 S.W.2d 793 (Mo. App.1976); and *State v. Britt*, 504 S.W.2d 38 (Mo.1973). A close examination of these cases reveals that in all three there was a substantial foundation laid connecting the defendant's possession of the money with that taken in the robbery.

In *Gyngard*, defendant and an accomplice took between $229 and $249 in a robbery, and defendant was arrested three hours later in possession of $104. The accomplice's wife testified that one-half hour after the robbery defendant and her husband arrived at her home; that they went to the bathroom to clean up and emerged within 10 minutes unchanged in appearance and gave her $20. Assuming a two-way split, the money divided shortly after the robbery totaled $228.

In *Harris*, $120 was taken by defendant and an accomplice. They were arrested after a vehicular chase, $122 was found in their possession, and the state had two eyewitnesses to the crime, one of whom participated in the pursuit of the defendant.

In *Britt*, $300 was taken, including coins in wrappers. Defendant was arrested, along with others, 2½ hours later, in possession of $301, while riding in the car identified as the one used in the robbery. A coin wrapper of the type taken in the robbery was also found in the car, and two eyewitnesses positively identified defendant.

Only *Vernor* approaches the factual situation in the instant case, and there the erroneous admission of the evidence was not deemed prejudicial for the reasons previously stated. The state's case here, quite frankly, is thin and hinged primarily on the testimony of Mrs. Denney. It cannot be said, in light of the weakness of that testimony, that the admission of the money was not prejudicial. Standing alone, the prejudicial effect of the introduction of the $90 might be a close question under *Vernor*, but given the closeness of the case and the cumulative effect of the error with the message to the jury, it is under these facts prejudicial error, and the money should not be admitted in another trial.

The case is reversed and remanded for a new trial.

All concur.